IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
Submitted On Briefs May 22, 2012

IN THE MATTER OF: STEVEN P.D. (D.O.B. 02/24/2007) and DALTON D. (D.O.B. 05/19/2008), Children Under Eighteen (18) Years of Age

Direct Appeal from the Juvenile Court for Henry County
No. 9939      Vicki S. Snyder, Judge

No. W2011-02489-COA-R3-PT - Filed July 25, 2012

This is a termination of parental rights case. The trial court concluded that it was in the best interests of the children to terminate the parental rights of Mother and Father on the grounds of abandonment by incarcerated parents, substantial noncompliance with the permanency plans, and persistence of conditions. On appeal, Mother and Father argue that DCS did not clearly and convincingly prove grounds for termination. Father further argues that DCS did not clearly and convincingly prove that termination was in the best interests of the children. Finally, Mother and Father argue that DCS failed to make reasonable efforts to reunify them with their children. After thoroughly reviewing the record, we affirm.

Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed
and Remanded

DAVID R. FARMER, J., delivered the opinion of the Court, in which ALAN E. HIGHERS, P.J., W.S., and J. STEVEN STAFFORD, J., joined.

Robert W. Hawley, Paris, Tennessee, for the appellant, Christina P.

Paul D. Hessing, Paris, Tennessee, for the appellant, Steven D.

Robert E. Cooper, Jr., Attorney General and Reporter and Alexander S. Rieger, Assistant Attorney General, for the appellee, Tennessee Department of Children's Services.

OPINION

I. Background and Procedural History

The minor children involved in this appeal, Steven P. D. (d.o.b. 2/24/07) and Dalton D.

(d.o.b. 5/19/2008), are the children of Christina P. ("Mother") and Steven D. ("Father"). In July 2007, the Department of Children's Services ("DCS") first received information that the children were exposed to drug abuse and were not supervised. Upon investigation of these allegations, DCS discovered drugs and drug paraphernalia in the home. Further, Mother admitted that she used drugs and tested positive on a drug screen for methamphetamine, amphetamine, and THC. Father was not living with Mother and the children at that time. On June 2, 2009, DCS received information that the children suffered from lack of supervision and environmental neglect. DCS conducted another investigation and found that both Mother and Father were abusing drugs, and further discovered evidence of domestic violence. While Father refused to take a drug screen, he admitted that he used marijuana. Mother took a drug screen and tested positive for methamphetamine, PCP, THC, and amphetamines.

On June 23, 2009, DCS filed a petition to adjudicate the children dependent and neglected and to provide court ordered services for the family. DCS provided services including counseling to address parenting skills, alcohol and drug issues, mental health intakes, parenting classes, and drug screens to ensure Mother and Father were not abusing drugs. The children only remained living with the parents for a short period of time. On July 5, 2009, Mother was arrested and charged with underage consumption while she was in the car with the children. As a result, DCS removed the children and placed them in Father's sister's home.

On July 15, 2009, the trial court conducted the preliminary hearing. At the hearing, Mother and Father were ordered to submit to a random drug screen, the results of which indicated that Mother tested positive for marijuana and benzodiazepines,[1] and Father tested positive for marijuana and methamphetamine. At the conclusion of the hearing, the trial court ordered Mother and Father to submit to random drug screens, attend counseling to address domestic violence, anger management, individual and group counseling and therapy, follow recommendation of service providers, and pay child support in the amount of $25.00 per week. The trial court further ordered Mother to attend a moral recognition therapy program, have a drug and alcohol assessment, and follow recommendations, and ordered Father to have medication management and follow recommendations. Shortly after the preliminary hearing, however, Father's sister insisted that she could no longer care for the children. Therefore, the trial court entered a protective custody order placing the children in the care and custody of DCS.[2]

On August 19, 2009, DCS created the first set of permanency plans for the children with the goal of reunification.[3] The plan requirements for Mother and Father were similar to those ordered

---

[1]According to the record, Mother tested positive for benzodiazepines because she was prescribed Xanax.

[2]The trial court also appointed a guardian ad litem and counsel for Mother and Father.

[3]While more than one set of permanency plans were created for the parents, the subsequent plans are almost identical to the initial plan with the additional requirements that Mother and Father obtain a safe
(continued...)

by the trial court at the preliminary hearing, and centered around their history of drug abuse, domestic violence, and volatile living situation. The plan required Mother to: (1) remain drug and alcohol free; (2) submit to random drug screens and hair follicle tests; (3) undergo an alcohol and drug assessment, and follow its recommendations; (4) continue anger management and drug counseling; (5) attend parenting classes and demonstrate skills learned during visitation; (6) have good mental health, comply with therapists and counselors, and be sober for appointments; (7) maintain contact with DCS and the children; and (8) resolve all legal issues, comply with court orders, and comply with all laws and requirements of probation. The plan required Father to: (1) remain drug and alcohol free; (2) submit to random drug screens and hair follicle tests, and do not attempt to alter the results of the tests; (3) undergo an alcohol and drug assessment, and follow its recommendations; (4) continue medication management; (5) work with anger management counseling; (5) attend parenting classes and demonstrate skills learned during visitation; and (6) resolve all legal issues, comply with court orders, and comply with all laws and requirements of probation.

On September 30, 2009, the trial court conducted the adjudicatory hearing. The trial court again ordered Mother and Father to submit to a random drug screen, the results of which indicated that Mother tested positive for marijuana and benzodiazepines,[4] and Father tested positive for marijuana. At the conclusion of the hearing, the trial court found that neither Mother nor Father had been compliant with the services offered by DCS. Moreover, both Mother and Father stipulated that the children were dependent and neglected. Thus, the trial court entered an order adjudicating the children dependent and neglected. Shortly thereafter, on October 28, 2009, the trial court conducted a hearing for the purposes of ratifying the permanency plans. Mother was not present at the hearing because she entered inpatient drug rehabilitation the previous day. At the conclusion of the hearing, the trial court approved and ratified the plans as being reasonably related to remedying the conditions that necessitated the removal of the children.

DCS's efforts to assist Mother and Father in complying with the permanency plans include: referred them to counseling programs; followed up with them if they missed counseling and rescheduled missed appointments; provided parenting classes; provided drug and alcohol assessments; paid for Father's drug and alcohol assessment and anger management; provided multiple drug screens; supervised visits; provided transportation; and when Mother and Father were in danger of losing their home, paid their rent and utility bill in order to keep supervised visits stable for them. Despite the efforts of DCS, Mother and Father struggled in complying with the permanency plans. Mother did not complete a 12-step program, consistently attend alcoholics anonymous, or engage in outpatient therapy as was recommended to her by her alcohol and drug assessment. Moreover, after seeking inpatient treatment for drug abuse issues, Mother tested

---

[3](...continued)
and stable home and provide proof of rent and utility payments.

[4]Similar to the drug test results at the preliminary hearing, the record indicates that Mother tested positive for benzodiazepines because she was prescribed Xanax.

positive on six different occasions for various substances. Similarly, Father failed drug screens on three different occasions. Father also admitted to smoking large amounts of meth, and eventually began refusing drug screens, stating that he would test positive. Furthermore, Father did not follow through with the requirements regarding anger management and domestic violence issues.

On November 4, 2010, DCS filed a petition to terminate the parental rights of Mother and Father. As grounds for termination, the petition alleged abandonment by incarcerated parents for failure to support and wanton disregard, substantial noncompliance with the permanency plans, and persistence of conditions. The petition further provided that termination of Mother and Father's parental rights was in the best interests of the children.

The trial court conducted a hearing on the termination petition on June 24, 2011. Officer Stephen Page testified about the repeated incarceration of Mother and Father for drug use and related offenses. Also, DCS Family Services Worker Terri Reeves ("Ms. Reeves") testified about the permanency plan requirements, the efforts of DCS, and Mother and Father's failure to meet the plans requirements. Ms. Reeves testified that Father never paid child support, Mother only made two of her child support payments after being brought before the child support court, that both parents worked or could have worked during that time, and that both Mother and Father have anger issues that have resulted in domestic violence in front of the children. Ms. Reeves further testified regarding the current placement of the children with family friends, and DCS's intentions to pursue adoptions for the children. Next, John Thompson ("Mr. Thompson"), a therapist from Nova Counseling, the counseling center Mother and Father were ordered to attend, testified that Mother and Father failed to attend all of the counseling sessions on alcohol and drug abuse, anger management, and parenting issues, and that neither parent completed the programs because of their lack of attendance. Mr. Thompson further testified that DCS paid for all of the services provided and worked very closely with the counseling center.

At the conclusion of the hearing, the trial court orally granted the petition to terminate the parental rights of Mother and Father after finding clear and convincing evidence of abandonment by incarcerated parents for failure to support and wanton disregard, substantial noncompliance with the permanency plans, persistence of conditions, and that termination was in the best interests of the children. Thereafter, on September 21, 2011, the trial court entered a written order memorializing its ruling. On October 20, 2011, Mother and Father individually filed notices of appeal to this Court.

## II. Issues Presented

Mother and Father present the following issues, as restated, for our review:

(1)     Whether DCS clearly and convincingly proved grounds for termination of the parental rights of Mother and Father, and

(2)     Whether DCS made reasonable efforts to reunify Mother and Father with the children?

In addition, Father presents the following issue for our review:

(3)     Whether DCS clearly and convincingly proved that termination of the parental rights of Father was in the best interests of the children?

### III.  Standard of Review

We review a trial court's findings of fact *de novo* upon the record, according a presumption of correctness to the findings unless a preponderance of the evidence is to the contrary.  Tenn. R. App. P. 13(d); *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002) (citation omitted).  No presumption of correctness attaches to a trial court's conclusions of law.  Tenn. R. App. P. 13(d); *Bowden v. Ward*, 27 S.W.3d 913, 916 (Tenn.2000) (citation omitted).  We will not reevaluate the determinations of a trial court based on an assessment of credibility unless clear and convincing evidence is to the contrary.  *In re M.L.D.*, 182 S.W.3d 890, 894 (Tenn. Ct. App. 2005) (citation omitted).  Furthermore, where the trial court has not made a specific finding of fact, we review the record *de novo*.  *In re Valentine*, 79 S.W.3d at 546 (citation omitted).

Tennessee Code Annotated section 36–1–113 governs the termination of parental rights.  This provision of the Code provides, in pertinent part:

> (c) Termination of parental or guardianship rights must be based upon:
> (1) A finding by the court by clear and convincing evidence that the grounds for termination of parental or guardianship rights have been established; and
> (2) That termination of the parent's or guardian's rights is in the best interests of the child.

Tenn. Code Ann. § 36–1–113(c)(1), (2) (2010).  This two-step analysis requires appellate courts to consider "whether the trial court's findings, made under a clear and convincing standard, are supported by a preponderance of the evidence."  *In re F.R.R., III*, 193 S.W.3d 528, 530 (Tenn. 2006).  "Although the 'clear and convincing evidence' standard is more exacting than the 'preponderance of the evidence' standard, it does not require the certainty demanded by the 'beyond a reasonable doubt' standard."  *In re M.A.B.*, No. W2007–00453–COA–R3–PT, 2007 WL 2353158, at *2 (Tenn. Ct. App. Aug. 20, 2007) (citation omitted).  "Clear and convincing evidence is evidence that eliminates any substantial doubt and that produces in the fact-finder's mind a firm conviction as to the truth."  *Id.* (citation omitted).

The heightened burden of proof in parental termination cases requires us to distinguish between the trial court's findings with respect to specific facts and the "combined weight of these facts."  *In Re: Michael C. M.*, No. W2010–01511–COA–R3–PT, 2010 WL 4366070, at *2 (Tenn. Ct. App. Nov. 5, 2010) (quoting *In Re: M.J.B.*, 140 S.W.3d 643, 654 n.35 (Tenn. Ct. App. 2004)).  Although we presume the trial court's specific findings of fact to be correct if they are supported by a preponderance of the evidence, we "must then determine whether the combined weight of these facts provides clear and convincing evidence supporting the trial court's ultimate factual conclusion."

*Id.*

## IV. Analysis
### A. Grounds for Termination

The first issue before this Court is whether DCS clearly and convincingly proved grounds for termination. This Court will affirm a trial court's finding of grounds if DCS clearly and convincingly proved at least one of the statutory bases for termination. *State, Dep't of Children's Servs. v. Mims*, 285 S.W.3d 435, 449 (Tenn. Ct. App. 2008) (citation omitted). The grounds before this Court are abandonment, Tenn. Code Ann. § 36-1-113(g)(1), substantial noncompliance with the permanency plans, Tenn. Code Ann. § 36-1-113(g)(2), and persistence of the conditions that required the removal of the children, Tenn. Code Ann. § 36-1-113(g)(3).

### 1. Abandonment by Incarcerated Parents

Tennessee Code Annotated section 36–1–113(g)(1) provides for termination if "[a]bandonment by the parent or guardian, as defined in § 36-1-102, has occurred . . . ." As pertinent to this issue, Tennessee Code Annotated section 36-1-102 provides:

> (1)(A) For purposes of terminating the parental or guardian rights of parent(s) or guardian(s) of a child to that child in order to make that child available for adoption, "abandonment" means that:
>
> . . . .
>
> (iv) A parent or guardian is incarcerated at the time of the institution of an action or proceeding to declare a child to be an abandoned child, or the parent or guardian has been incarcerated during all or part of the four (4) months immediately preceding the institution of such action or proceeding, and either has willfully failed to visit or has willfully failed to support or has willfully failed to make reasonable payments toward the support of the child for four (4) consecutive months immediately preceding such parent's or guardian's incarceration, or the parent or guardian has engaged in conduct prior to incarceration that exhibits a wanton disregard for the welfare of the child; . . . .

Tenn. Code Ann. § 36-1-102(1)(A)(iv). In *In re Audrey S.*, 182 S.W.3d 838 (Tenn. Ct. App. 2005), we explained the definition of abandonment in the context of incarcerated parents:

> This definition contains two distinct tests for abandonment. These additional tests for abandonment apply only if a parent is incarcerated at or near the time of the filing of the termination petition. The first test asks whether the parent "has willfully failed to visit[,] . . . support [,] or . . . make reasonable payments toward the support of the child for four (4) consecutive months immediately preceding such parent's . . .

incarceration." Tenn. Code Ann. § 36–1–102(1)(A)(iv). This test tracks the language of the first statutory definition of abandonment but shifts the focus from the four-month period immediately preceding the filing of the termination petition to the four-month period immediately preceding the parent's incarceration. The concept of "willfulness" is the same under both provisions. Tenn. Code Ann. § 36–1–102(1)(B)–(E). The second test asks whether the parent "has engaged in conduct prior to incarceration which exhibits a wanton disregard for the welfare of the child." Tenn. Code Ann. § 36–1–102(1)(A)(iv). This test has no analog in the first statutory definition of abandonment, and it is not expressly limited to any particular four-month period.

*Id.* at 865. The trial court determined that Mother and Father abandoned the children based on their willful failure to make reasonable payments toward the support of the children for four consecutive months immediately preceding their incarceration, and for wanton disregard. We shall consider each in turn.

### a. Willful Failure to Make Reasonable Child Support Payments

In the case at bar, DCS filed the petition to terminate Mother and Father's parental rights on November 4, 2010. Thus, the relevant four month period immediately preceding the filing of the termination petition was July 4, 2010 through November 4, 2010. During this time, Mother was incarcerated from August 8, 2010 to August 25, 2010, and from August 27, 2010 to September 21, 2010. Father was incarcerated on July 4, 2010, and from September 29, 2010 to October 5, 2010.[5] The last four month period in which Mother was not incarcerated was from February 28, 2010 to June 28, 2010. The last four month period in which Father was not incarcerated was from November 21, 2009 to March 21, 2010. At the preliminary hearing on July 15, 2009, the trial court ordered Mother and Father to pay child support in the amount of $25.00 per week. Thereafter, the trial court modified this amount with regard to Father, and ordered him to pay $201.50 per month beginning

---

[5]From the time the children were removed from their parents until the time of the termination hearing, Mother was incarcerated seven times and Father was incarcerated nine times.

Mother's time spent incarcerated was: July 5, 2009 to July 6, 2009 (underage drinking); September 8, 2009 to September 10, 2009 (underage drinking); September 17, 2009 to September 18, 2009 (underage drinking); September 29, 2009 (violation of probation); June 29, 2010 (failure to appear); August 8, 2010 to August 25, 2010 (mittimus warrant); and August 27, 2010 to September 21, 2010 (violation of probation).

Father's time spent incarcerated was: March 22, 2010 (vandalism); April 13, 2010 to April 14, 2010 (domestic assault); May 28, 2010 to May 30, 2010 (domestic assault); June 4, 2010 to June 6, 2010 (domestic assault); June 11, 2010 to June 12, 2010 (domestic assault); July 4, 2010 (reckless driving); September 29, 2010 to October 5, 2010 (aggravated assault and violation of probation); February 16, 2011 to March 1, 2011 (failure to appear to serve jail sentence, assault, evading arrest, driving on a cancelled/suspended license, and two counts of violation of probation); and March 2, 2011 to June 9, 2011 (failure to appear, evading arrest, and driving on a cancelled/suspended license).

on January 1, 2010.

It is undisputed that Father did not make any child support payments since the children were removed into the custody of DCS. Father argues that he could not afford to make any payments, therefore his failure to do so could not be seen as willful. The record, however, indicates that Father was capable of working during this time, and that he was employed at various times, including jobs he worked in Union City and at McCarthey's Produce. Thus, we agree with the trial court's conclusion that Father abandoned the children by willfully failing to make reasonable payments toward their support during the four consecutive months in which he was not incarcerated.

Although the record indicates that Mother made two child support payments in May 2010, she only did so in response to a court order from the child support court. The trial court found that Mother was able to work during this time. Also, Mother was somehow able to afford to support her frequent illegal drug usage. In light of Mother's failure to make a single payment for approximately ten months, these two court ordered payments were nothing more than token support. Moreover, the fact that it took a court order to finally force Mother to pay child support could hardly be considered willful conduct on her behalf. Accordingly, we find no error in the trial court's determination that Mother abandoned the children by willfully failing to make reasonable payments toward their support during the four consecutive months in which she was not incarcerated.

### b. Wanton Disregard

As noted above, the trial court also concluded that Mother and Father abandoned the children because, prior to their incarceration, they engaged in conduct that exhibited a wanton disregard for the welfare of the children. The trial court found that Mother's failure to resolve her legal issues, obtaining additional criminal charges resulting in her incarceration, and continued use of illicit drugs all amounted to wanton disregard. The trial court also found that Father's incarceration for aggravated assault and continued use of illicit drugs constituted wanton disregard within the meaning of the statute. As this Court has frequently held, "probation violations, repeated incarceration, criminal behavior, substance abuse, and failure to provide adequate support or supervision for a child can, alone, or in combination, constitute conduct that exhibits a wanton disregard for the welfare of a child." *In re Audrey S.*, 182 S.W.3d 838, 867-68 (Tenn. Ct. App. 2005). In the case at bar, Mother and Father admitted, and numerous drug screens proved, that they abused drugs while their children were in the custody of DCS. Moreover, Mother and Father were repeatedly incarcerated, at times for violating probation, and both failed to provide adequate support for their children. In light of the totality of the circumstances, we find that clear and convincing evidence exists to support the trial court's termination of Mother and Father's parental rights on the ground of abandonment by incarcerated parents for wanton disregard.

### 2. Substantial Noncompliance

Tennessee Code Annotated section 36-1-113(g)(2) establishes a ground for termination if "[t]here has been substantial noncompliance by the parent or guardian with the statement of

responsibilities in a permanency plan or a plan of care pursuant to the provisions of title 37, chapter 2, part 4." Tenn. Code Ann. § 36-1-113(g)(2). Termination for substantial noncompliance is warranted only when the plan's requirements are "'reasonable and related to remedying the conditions which necessitate foster care placement.'" *In re Valentine*, 79 S.W.3d 539, 547 (Tenn. 2002) (quoting Tenn. Code Ann. § 37-2-403(a)(2)(C)). The determination of whether noncompliance is substantial compares the degree of noncompliance with the importance of the unmet obligation. *In re M.J.B.*, 140 S.W.3d 643, 656 (Tenn. Ct. App. 2004) (citations omitted). "Trivial, minor, or technical deviations from a permanency plan's requirements will not be deemed to amount to substantial noncompliance." *Id.* at 656-57 (citations omitted).

In its final order terminating Mother and Father's parental rights, the trial court states:

[Mother] has not substantially complied with the responsibilities and requirements set out for her in the permanency plans. [Mother] has not complied with the recommendations of her alcohol and drug treatment program at Buffalo Valley, she has incurred additional legal charges, she has failed to provide proof that she applied for the Safety Net program at Carey Counseling, she has failed to demonstrate effective parenting skills, and she has failed to obtain a mental health intake and follow the recommendations.

[Father] has not substantially complied with the responsibilities and requirements set out for him in the permanency plans. [Father] has not demonstrated the ability to control his anger, he has continued to test positive or admit to illicit drug use; he has failed to provide verification of a stable home through rent and utility receipts, he has failed to pay child support, and he has incurred new criminal charges.

. . . .

Despite assistance from DCS, [Mother] has not followed the recommendations of her discharge summary from Buffalo Valley and continues to acknowledge she uses drugs and has a drug problem. [Mother] has not established a safe and stable home for the children nor has she [been] attending counseling to address her mental health needs. [Mother] has also failed to pay child support for the children.

Despite assistance from DCS, [Father] has not completed alcohol and drug counseling or anger management counseling. [Father] continues to admit that he is using illegal drugs. [Father] has not resolved his legal issues and has obtained additional criminal charges for assault.

We agree with the trial court that clear and convincing evidence existed to terminate the parental rights of Mother and Father based on their substantial noncompliance with the permanency plans. As noted above, the permanency plans for Mother and Father required that they remain drug and alcohol free, complete anger management counseling, complete alcohol and drug counseling,

provide a safe and stable home for the children, attend parenting classes, comply with the recommendations of counselors and assessments, and comply with all laws and requirements of probation. These requirements illustrate the ultimate goal for the parents which was to eliminate the drug abuse, domestic violence, and unsafe living conditions that the children were subjected to before they were removed into the custody of DCS.

Unfortunately, both Mother and Father failed to comply with these requirements. Mother failed to complete a 12-step program, failed to consistently attend alcoholics anonymous, and did not engage in outpatient therapy as recommended by her alcohol and drug assessment. Following her completion of inpatient treatment at Buffalo Valley for her drug abuse issues, Mother tested positive on six different occasions for various drugs. Likewise, Father failed drug screens on three different occasions. Father also did not follow through with the requirements regarding anger management and domestic violence issues. Most notably, Father admits in his brief that he stopped working toward the plan requirements in April 2010 after he was arrested for domestic assault against Mother during an unsupervised visit with the children. After that incident, Father admitted to smoking large amounts of methamphetamine, and eventually began refusing DCS's attempts to administer drug screens, stating that he would test positive. Accordingly, we find no error in the trial court's decision to terminate the parental rights of Mother and Father for substantial noncompliance with the permanency plans.

### 3. Persistence of Conditions

Tennessee Code Annotated section 36-1-113(g)(3) establishes a ground for termination if:

The child has been removed from the home of the parent or guardian by order of a court for a period of six (6) months and :
>    (A) The conditions that led to the child's removal or other conditions that in all reasonable probability would cause the child to be subjected to further abuse or neglect and that, therefore, prevent the child's safe return to the care of the parent(s) or guardian(s), still persist;
>    (B) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent(s) or guardian(s) in the near future; and
>    (C) The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable and permanent home[.]

Tenn. Code Ann. § 36-1-113(g)(3)(A)-(C). A finding of persistence of conditions is permissible only if DCS presents clear and convincing evidence to establish each statutory element. *In re Giorgianna H.*, 205 S.W.3d 508, 518 (Tenn. Ct. App. 2006) (citation omitted).

On August 5, 2009, the trial court entered an order removing the children into the custody of DCS. The conditions that led to the removal of the children included Mother and Father's history

of drug abuse, domestic violence in the home, and volatile living environment. In its final order, the trial court concluded:

> Those conditions still persists as [Mother] and [Father] continue to admit to using illegal drugs and they have been involved in incidents of assault since the removal. [Mother] has failed to successfully complete alcohol and drug treatment by not following the recommendations of her inpatient program and by continuing to abuse drugs. [Mother] has not established a safe and stable home for the children. [Father] continues to use illegal drugs and has not established a safe and stable home for the children.

After reviewing the record, we agree with the trial court's determination that DCS clearly and convincingly proved the ground of persistence of conditions. At the time of the termination hearing, Mother and Father were struggling with the same drug abuse and domestic violence issues that caused their children to be removed from their custody fourteen months earlier. Despite the efforts of DCS, Mother and Father failed to make the necessary progress to ensure a safe and stable living environment in which to raise their children. The record clearly shows that Mother and Father either refuse to, or cannot, change their circumstances in the foreseeable future. Given the parents' ongoing issues of drug abuse and domestic violence, the continuation of the parent-child relationship greatly diminishes the chances of the children integrating into a safe, stable, and permanent home. Furthermore, the children are thriving in DCS custody, are "happy little boys," and DCS plans to pursue adoptions for the children. Termination of parental rights on the ground of persistence of conditions is intended "to prevent the child's lingering in the uncertain status of foster child if a parent cannot within a reasonable time demonstrate an ability to provide a safe and caring environment for the child." *In re Arteria H.*, 326 S.W.3d 167, 178 (Tenn. Ct. App. 2010) (citations omitted). Therefore, we affirm the trial court's decision to terminate the parental rights of Mother and Father on the ground of persistence of conditions.

### B.  Reasonable Efforts

The next issue before this Court is whether DCS made reasonable efforts to help reunite Mother and Father with the children. The decision to pursue a termination of parental rights on the grounds of abandonment, persistence of conditions, and substantial noncompliance generally invokes DCS's statutory duty to make reasonable efforts to facilitate the safe return of a child to the child's home. *In re R.L.F.*, 278 S.W.3d 305, 315 (Tenn. Ct. App. 2008) (citing Tenn. Code Ann. § 37–1–166(b), –166(a)(2), –166(g)(2)); see also *In re Tiffany B.*, 228 S.W.3d 148, 151, 160 (Tenn. Ct. App. 2007) (vacating a finding of abandonment, substantial noncompliance, and persistence of conditions for failure to make reasonable efforts). Although DCS may be relieved of its duty to make reasonable efforts after a court of competent jurisdiction finds "aggravating circumstances," Tenn. Code Ann. § 37–1–166(g)(4)(A)–(C), it cannot withhold reasonable efforts "'in the hopes that a court will later make a finding . . . that retroactively 'forgives' DCS's lack of efforts. . . .'" *In re Keisheal N.E.*, No. M2009–02527–COA–R3–PT, 2010 WL 2176104, at * 13 (Tenn. Ct. App. May 28, 2010) (*no perm. app. filed*) (quoting *In re B.L.C.*, No. M2007–01011–COA–R3–PT, 2007 WL

4322068, at *9 (Tenn. Ct. App. Dec.6, 2007)).

The statutory duty to make reasonable efforts includes an obligation to exercise "'reasonable care and diligence . . . to provide services related to meeting the needs of the child and the family.'" *In re R.L.F.*, 278 S.W.3d at 316 (emphasis omitted) (citing Tenn. Code Ann. § 37–1–166(g)(1)). Courts evaluate the reasonableness of DCS's efforts in light of the following factors:

> (1) the reasons for separating the parents from their children, (2) the parents' physical and mental abilities, (3) the resources available to the parents, (4) the parents' efforts to remedy the conditions that required the removal of the children, (5) the resources available to the Department, (6) the duration and extent of the parents' efforts to address the problems that caused the children's removal, and (7) the closeness of the fit between the conditions that led to the initial removal of the children, the requirements of the permanency plan, and the Department's efforts.

*In re Tiffany B.*, 228 S.W.3d at 158–59 (footnote omitted) (citing *In re Giorgianna H.*, 205 S.W.3d 508, 519 (Tenn. Ct. App. 2006)). Courts should decide the reasonableness of DCS's efforts "on a case-by-case basis in light of the unique facts of the case." *In re Bernard T.*, 319 S.W.3d 586, 601 (Tenn. 2010) (citing *In re J.C.D.*, 254 S.W.3d 432, 446 (Tenn. Ct. App. 2007)). The burden is on DCS to prove clearly and convincingly the reasonableness of its efforts. *In re R.L.F.*, 278 S.W.3d at 316 (citing *In re B.B.*, No. M2003–01234–COA–R3–PT, 2004 WL 1283983, at *9 (Tenn. Ct. App. June 9, 2004)).

The exercise of reasonable efforts is important because "[t]he success of a parent's remedial efforts generally depends on the Department's assistance and support." *In re Giorgianna H.*, 205 S.W.3d at 518 (citations omitted). DCS employees must affirmatively and reasonably utilize their education and training to help parents eliminate the conditions requiring removal of their children and to meet the responsibilities of their permanency plans before courts will terminate the parent-child relationship. *In re R.L.F.*, 278 S.W.3d at 316 (citations omitted). DCS's duty to affirmatively assist parents exists even if the parents do not seek assistance. *Id.* (citing *In re C.M.M.*, 2004 WL 438326, at *7). "While the Department's reunification efforts need not be 'herculean,' the Department must do more than simply provide the parents with a list of services and send them on their way." *In re Giorgianna H.*, 205 S.W.3d at 519 (citation omitted).

The legislature, however, did not place the burden to reunify parent and child on DCS's shoulders alone. *See State, Dep't of Children's Servs. v. Estes*, 284 S.W.3d 790, 801 (Tenn. Ct. App. 2008) (citation omitted). Reunification "is a two-way street, and neither law nor policy requires the Department to accomplish reunification on its own without the assistance of the parents." *In re Tiffany B.*, 228 S.W.3d at 159 (citations omitted). "Parents share the responsibility for addressing the conditions that led to the removal of their children from their custody." *Id.* Once services have been made available, parents must make reasonable efforts to rehabilitate themselves. *Id.* (citations omitted).

Regarding the efforts of DCS to assist Mother and Father, the trial court's final order provides:

> [DCS] has made reasonable efforts to assist the parents in achieving the goals on the permanency plans. Ms. Reeves referred [Mother] to Wolfe Counseling for a parenting assessment and DCS paid for said assessment. Ms. Reeves has seen [Mother] at least weekly since August 2009, and in February 2011 began seeing her twice weekly, to assist in supervising additional visitations. Ms. Reeves spoke with [Mother] about the need for her to successfully complete services and what needed to be done to complete the tasks on the Permanency Plan each time she met with her. Ms. Reeves provided transportation to [Mother] on various occasions and [Mother] was aware she could contact Ms. Reeves for transportation. Ms. Reeves sat with [Mother] at a visit and called and made an appointment for counseling services after [Mother] missed an appointment and had not rescheduled it. [Mother] also failed to attend the appointment they set together. Despite her encouragement and offers to help, Ms. Reeves was not able to motivate [Mother] to attend her appointments as recommended or address her substance abuse issues. [Mother] always appeared honest regarding her drug usage and would acknowledge her drug use during their conversations. Throughout the duration of the case, [Mother] stayed with various friends and family and did not have a stable residence. [Mother] and [Father] established a residence . . . in Paris, Tennessee, and DCS paid for the first month of utilities and rent to assist them. However, they did not remain in the home. [Mother] also informed Ms. Reeves that she was unaware of anything else Ms. Reeves could do to get her to complete the tasks on the Permanency Plans and that she knew what she needed to do.
>
> Ms. Reeves provided transportation to [Father]; referred him for services at Nova Counseling; and provided in-home services and therapeutic visitation through Wolfe Counseling.

As mentioned above, DCS provided and paid for numerous services for Mother and Father. DCS referred them to counseling programs; followed up with them if they missed counseling and rescheduled missed appointments; provided parenting classes; provided drug and alcohol assessments; paid for Father's drug and alcohol assessment and anger management; provided multiple drug screens; supervised visits; provided transportation; and when Mother and Father were in danger of losing their home, paid their rent and utility bill in order to keep supervised visits stable for them. Moreover, Mr. Thompson testified at the termination hearing that DCS paid for all services provided and worked very close with the counseling center to assist the parents with their drug abuse, anger management, domestic violence, and parenting issues. Unfortunately, Mother and Father failed to take advantage of the services offered to them. Instead, it was Mother and Father's ongoing drug abuse, domestic violence, and repeated incarceration that impeded the ability of DCS to assist them. Furthermore, Father admits that, besides attending supervised visitation, he made no efforts to comply with the permanency plans after April 2010 when he was arrested for domestic

assault against Mother. In light of the forgoing discussion, we conclude that DCS made reasonable efforts to reunify Mother and Father with their children.

### C. Best Interests

Finally, we must address whether termination of Mother and Father's parental rights was in the best interests of the children.[6] Termination of parental rights is appropriate only if clear and convincing evidence establishes that eliminating those rights is in the best interests of the child or children named in the petition. Tenn. Code Ann. § 36–1–113(c)(2) (2010). Courts consider the following non-exhaustive list of factors when determining the best interests of a child:

> (1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;
> (2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;
> (3) Whether the parent or guardian has maintained regular visitation or other contact with the child;
> (4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;
> (5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;
> (6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;
> (7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol or controlled substances as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;
> (8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or
> (9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36–5–101.

---

[6]Mother does not challenge the trial court's best interest determination on appeal. Nevertheless, we shall consider this issue as it relates to both Mother and Father. *See In re: A'Mari B.*, 358 S.W.3d 204, 211 (Tenn. Ct. App. 2011) ("In the interest of justice" this Court analyzed the trial court's best interest determination as to both parents despite Mother's failure to raise the issue on appeal); *see also In re: Johnny J.E.M.*, No. E2011-02192-COA-R3-PT, 2012 WL 1929802, at *12 n.3 (Tenn. Ct. App. May 29, 2011) ("Although Father does not challenge the trial court's best-interest determination, we review this issue as to both Mother and Father.").

-14-

Tenn. Code Ann. § 36–1–113(i)(1)–(9).  "Every factor need not be applicable in order for the trial court to determine that it is in the best interest of the child for a parent's right[s] to be terminated." *In re D.C.A.*, No. M2008–01279–COA–R3–PT, 2009 WL 837877, at *8 (Tenn. Ct. App. Mar. 30, 2009) (*no perm. app. filed*).  The weight and relevance of these factors may vary from case to case and it is possible that a single factor is determinative. *Id.* (citing *In re Audrey S.*, 182 S.W.3d 838, 878 (Tenn. Ct. App. 2005)).  In evaluating the issue of best interests, the court must remember that any conflict between the best interests of a child and the adult parent "shall always be resolved to favor the rights and the best interests of the child. . . ."  Tenn. Code Ann. § 36–1–101(d).

For the reasons discussed above, we agree with the trial court that Mother and Father have failed to make an adjustment of circumstances in their lives to make it safe for the children to be returned to their home.  Despite the efforts of DCS, Mother and Father continue to struggle with the same drug abuse and domestic violence issues that plagued their home when the children were removed from their custody.  Also, Mother and Father have failed to support the children.  On the other hand, the children have adapted to their current environment, and DCS plans to pursue adoptions for the children with their foster family.  To return the children to Mother and Father while they continue to struggle with drug abuse and domestic violence would undoubtedly be detrimental to the children's emotional and physical well-being.  Therefore, we conclude that the evidence presented clearly and convincingly established that terminating the parental rights of Mother and Father was in the best interests of the children.

## V.  Conclusion

For the foregoing reasons, we affirm the judgment of the trial court.  Costs of this appeal are taxed to the Appellants, Christina P. and Steven D., for which execution may issue if necessary.

_____
DAVID R. FARMER, JUDGE